1
2
3
4

Sarah R. London (CA Bar No. 267083)
LIEFF CABRASER HEIMANN & BERNSTEIN
275 Battery Street, 29th Floor
San Francisco, CA 94111
Telephone:  (415) 956-1000
Facsimile:   (415) 956-1008

5

*Attorneys for Plaintiff K.K.*

6

UNITED STATES DISTRICT COURT

7

NORTHERN DISTRICT OF CALIFORNIA

8

SAN FRANCISCO DIVISION

9

10

K.K.,

11

Plaintiff,

12

v.

13

Uber Technologies Inc.,
Rasier, LLC, and Rasier-CA, LLC,

14

Defendants.

15

CASE NO.   3:24-cv-1514

**COMPLAINT (JURY TRIAL DEMANDED)**

16

17

18

19

20

Plaintiff K.K. by and through her undersigned counsel, makes the following Complaint against Defendants Uber Technologies, Inc., a Delaware corporation (individually "Uber"), Rasier Inc., LLC, a Delaware limited liability company, and Rasier-CA, LLC, a Delaware limited liability company (together with Raiser Inc., LLC, "Rasier") (all three collectively "Uber" or "Defendants").

21
22
23
24
25
26
27
28

## NATURE OF THE ACTION

1.     Plaintiff was sexually assaulted by an Uber driver who drove her home, then returned to rape her.  This case is about Plaintiff's assault, as well as the toxic and toxic-male culture at Uber that caused or contributed to it. This culture, which started at the very top of Uber, prioritized growth above all else and in the process, exploited, endangered, and hurt Uber's customers, including Plaintiff. This culture was put in place by Uber's officers and directors, including Travis Kalanick, with conscious disregard for the rights and safety of Uber passengers, particularly female and LGBTQ+ Uber passengers.

2.     Uber is a transportation network company headquartered in San Francisco, California that, beginning in 2009, created an application-based transportation system that has been implemented around the world, including across the entire United States and in this State.

3.     As early as 2014, Uber became aware that Uber drivers were physically and sexually assaulting and raping passengers, especially female and LGBTQ+ passengers. In the decade since, those driving for Uber have continued to sexually assault, harass, kidnap, physically assault, rape, or otherwise attack Uber's passengers. Complaints to Uber by passengers who have been attacked by Uber drivers, combined with subsequent criminal investigations by law enforcement, clearly establish that Uber has been fully aware of these continuing attacks by sexual predators driving for Uber. Uber's response to these ongoing sexual assaults by Uber drivers has been slow and inadequate and has put the lives and well-being of its customers at grave risk.

4.     While Uber has, in recent years, publicly acknowledged this sexual-assault crisis—including the publication of Uber's U.S. Safety Report, in December 2019—Uber has failed to implement basic safety measures necessary to prevent these serious physical and sexual assaults, which continue to occur to this day.

5.     As more fully set forth below, Plaintiff was assaulted by an Uber driver who Plaintiff was led to believe would give her a safe ride to her destination.  Instead, the Uber driver raped her.

6.     The Uber ride at issue was ordered by Plaintiff through the ride-sharing software application owned and controlled by Uber ("the Uber App").

7.     At all relevant times, Defendants Uber and Rasier operated and controlled the Uber App.

8.     The Uber driver, while in the course and scope of his employment for Uber and while otherwise working on behalf of Uber, assaulted Plaintiff as more fully set forth below.

9.     Plaintiff brings this civil action against Uber to recover damages for the injuries she suffered as a result of being assaulted by the Uber driver during an Uber ride, as well as appropriate injunctive or equitable relief to protect Plaintiff and passengers like her.

**PARTIES**

10.    Plaintiff K.K. is over the age of 18 and is a resident of Las Vegas, Nevada. The assault described below took place in the State of Nevada.

11.    Defendant Uber Technologies, Inc. is a Delaware corporation with its corporate headquarters, principal office, and principal place of business at 1515 3rd Street, San Francisco, California, 94158.

12.    Defendant Rasier, LLC is a Delaware limited liability company. On information and belief, Rasier is a wholly owned subsidiary of Uber Technologies, Inc. Rasier maintains its corporate headquarters, principal office, and principal place of business at 1515 3rd St., San Francisco, California, 94158.

13.    Defendant Raiser-CA, LLC is a Delaware limited liability company. On information and belief, Rasier is a wholly owned subsidiary of Uber Technologies, Inc. Rasier maintains its corporate headquarters, principal office, and principal place of business at 1515 3rd St., San Francisco, California, 94158.

14.    Unless otherwise specified, this Complaint refers to Defendants Uber Technologies, Inc., Rasier, LLC, and Rasier-CA, LLC collectively as "Uber."

15.    The Uber driver who perpetrated the assault described herein ("Uber driver") was an agent, servant, and employee of Uber.

16.     Uber is liable for the acts of the Uber driver through principles of respondeat superior, agency, ostensible agency, partnership, alter-ego, and other forms of vicarious liability.

## JURISDICTION AND VENUE

17.     The Court has subject matter jurisdiction under 28 U.S.C. § 1332 because Plaintiff is a citizen of Nevada and Defendants are citizens of Delaware and California.

18.     Venue is proper in this Court under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claim occurred in this judicial district.

## FACTUAL BACKGROUND

### *The Uber App*

19.     Uber is a transportation network company in the business of providing ground transportation to its customers through an online mobile-enabled application.[1] The Uber App connects individuals seeking to procure transportation (hereinafter "customers," "passengers," "riders," or "users") with individuals who use their personal vehicles to provide transportation in exchange for compensation (hereinafter "drivers" or "employees"). Users pay for transportation ("rides") through the Uber App. Drivers are compensated by Uber through the driver version of the Uber App. Both versions of the Uber App connect to the same website, Uber.com, which is Uber's website.

20.     Uber's business model is dependent on having enough drivers available to keep up with customer demand. However, there is extremely high turnover amongst Uber drivers.[2]

21.     Consequently, Uber's business model prioritizes hiring new drivers at a high rate and places a diminished focus on removing drivers who exhibit behaviors that pose or signal risks to customers. In doing so, Uber compromises customer safety, including the safety of Plaintiff.

22.     When users arrange transportation with the Uber App, they input their destination and request a driver. The Uber App then matches the user with a nearby driver, using an

---

[1] Two versions of the Uber App are available: one for passengers and one for drivers. When logged into the customer version of the Uber App, a user can request a ride. When logged into the driver version of the Uber App, registered Uber drivers are notified of requested rides which they can then accept and receive compensation for providing, as described herein. Unless otherwise specified, references to the Uber App refer to the passenger version of the Uber App. No fee is charged to download or install either version of the Uber App.

[2] *See* James Doubek, *Uber, Lyft Drivers Earning a Median Profit of $3.37 Per Hour, Study Says*, NPR (Mar. 2, 2018), available at https://www.npr.org/sections/thetwo-way/2018/03/02/590168381/uber-lyft-drivers-earning-a-median-profit-of-3-37-per-hour-study-says.

COMPLAINT

algorithm. Uber drivers must be logged onto the Uber App and indicate their ability to provide rides to be matched with a passenger. The algorithm does not merely match the closest driver with the closest user, but can match multiple drivers to users at once with the purpose of promoting efficiency. When a driver is alerted to a request for a ride, they may then "accept" the ride by manually interfacing with the Uber App. Drivers are required to "accept" rides when they are logged into the Uber App; drivers who do not "accept" enough rides when logged into the Uber App risk discipline up to and including suspension or termination. In general, drivers have approximately fifteen seconds to "accept" rides to avoid the risk of discipline.

23.     At the conclusion of the ride, both the customer and driver are prompted to rate each other on a five-star scale. If either the driver or customer gives each other a low- or one-star rating, they will not be matched by the Uber App's algorithm for any future ride. As discussed below, Uber uses this rating and matching system to prevent drivers for whom complaints of inappropriate behavior (such as sexual harassment or assault) from being matched with the customer who made the complaint in the future, but it does not prevent the driver from being matched with other customers. On information and belief, drivers whose star rating drops below a certain threshold set by Uber and varying from city to city based as determined by Uber, may be penalized through temporary suspensions, or occasionally, permanent termination from the Uber App. On information and belief, Uber uses the threat of temporary suspensions or permanent bans to control and modify the behavior of those employed as drivers.

***Uber Controls Its Drivers and Their Work***

24.     Uber drivers in general, and the Uber driver that sexually assaulted Plaintiff, have no control over the value of their services.

25.     Uber unilaterally sets the base fare, time fare, distance fare, wait-time fare, and all surge fares. Uber directly sets all prices.

26.     Uber had exclusive access to the customer list (passengers), customer locations, and the customer's destination requests, none of which is withheld from all Uber drivers.

27.     Uber assigns all drivers' work through its driver-passenger matching algorithm, which over which Uber maintains complete control. The Uber driver cannot choose which passenger to be matched with.

28.     Uber had exclusive control of the customer volume. Uber decided who, when, where, and how many ride requests to assign to the Uber driver.

29.     To begin work, Uber drivers log into the driver App and then wait for Uber to select a customer who required Uber's services.  Uber refers to this time that the Uber driver is activated but un-dispatched as "Period 1" time (or "P1").

30.     Uber uses real-time GPS monitoring to track Uber driver at all times while logged into the Uber App, beginning with P1 time. Additionally, Uber's patented technology allows Uber to monitor audio within the vehicle on a drive, the driver's speed, whether the driver is arriving within Uber's estimated time of arrival, whether the driver is taking the passenger "off route," and (amongst other things) whether the driver is operating his vehicle in an expected and acceptable way to Uber.

31.     During P1, Uber unilaterally decides when and where to send the Uber driver trip assignments for customers requesting rides.

32.     Once Uber gives an Uber driver a trip assignment, the Uber driver has only 15 seconds during which to "accept" the assignment. However, the appearance of a "decision" by the Uber driver as to whether to "accept" a ride is only superficial. Uber controls the information provided to the Uber driver during the 15 seconds. It does not provide the driver the estimated fare, estimated distance, passenger's pickup location, or final destination (despite possessing all of the information) to allow the driver to make an economic assessment. Moreover, on information and belief, if an Uber driver fails to "accept" three rides in a row, Uber disciplines the driver, including by suspending them from the system and limiting their ability to earn an income.

33.     Once the Uber driver accepts a trip assignment, the driver enters what Uber refers to as "Period 2" time ("P2"). This is the period in which the Uber driver is dispatched but has not picked up the passenger.

34.     During P2, Uber provides the Uber driver with the passenger's pickup location, but it still does not provide the Uber driver with the estimated fare or estimated trip time, distance, or destination.

35.     Upon arriving at the passenger's location, the Uber driver remains in P2 until the passenger physically enters the vehicle.  Once the passenger enters, the Uber driver must inform the driver App to begin the trip.  The time during which the Uber driver is transporting the passenger to their destination is referred to as "Period 3" ("P3").

36.     Uber decides the amount of payment for the fare incurred during P3. Uber exclusively sets the fare price, and the driver App provides no function that would allow the Uber driver to adjust the fare.

37.     Uber monitors the Uber driver's use of the App, the rate of accepted assignments, and the rate at which he cancels assignments, which Uber can use to deactivate or suspend the Uber driver.

38.     Uber exclusively maintains the right to deactivate or suspend the Uber driver from the driver App based on Uber's policies. Uber can therefore unilaterally terminate the Uber driver without notice or explanation.

39.     Uber drivers, including the Uber driver in this case, are tracked at all times while logged on the Uber App. Specifically, Uber tracks its drivers' location(s), routes, speed, and acceleration. If an Uber driver deviates from Uber's suggested route, Uber notifies the Uber driver that they are not following the suggested route.

40.     Uber processes all payments and distribution of payments to the Uber driver.

41.     The Uber driver's work is integral to Uber's business, as Uber cannot provide transportation services without drivers.

42.     Uber constantly evaluates Uber drivers behind the scenes. Uber maintains policies that analyze at multiple safety categories, including: claims of sexual misconduct; physical altercations; verbal altercations; inappropriate passenger contact; potential safety concerns; dangerous driving; and sexual assaults.

43.     Uber is aware when its drivers are acting inappropriately and are acting in a way that creates a potential safety concern.

44.     If an Uber driver violates a safety category, Uber issues "strikes", which amount to negative employment actions that will result in the driver being permanently removed from the Uber driver App if too many are issued. However, Uber does not inform the driver or passengers if they have issued prior strikes to the Uber driver.

45.     Uber is aware when an Uber driver becomes a safety risk, but Uber continues to allow predatory Uber drivers, like the one that assaulted Plaintiff, to maintain access to the Uber driver platform and injure passengers.

46.     Uber drivers are largely nonprofessional, untrained, and use their own vehicles. Uber employs and engages its drivers, including the driver who assaulted Plaintiff, in traditional at-will relationships, in which:

a.  Uber has discretion to fire its drivers for any reason and at any time; that is, Uber maintains the right to discharge its drivers at will, and without cause;

b.  Drivers are not charged a fee by Uber to apply to become employees;

c.  There is no agreement between Uber and drivers designating drivers as independent contractors;

d.  Drivers are not charged a fee to download the Uber App or to receive notifications from Uber that customers want rides;

e.  Fare prices for rides are set exclusively by Uber;

f.  Drivers have no input on fares charged to consumers;

g.  Drivers are not permitted to negotiate with consumers on fares charged;

h.  Drivers do not know what passengers are charged for a given ride;

i.  Uber can and does modify charges to consumers (for example, if Uber determines that a driver has taken a circuitous route to a destination);

j.  Uber takes a fee for every ride charged to a consumer;

k.  Uber retains control over customer-contact information;

l.   Uber controls its drivers' contacts with its consumer base and considers its consumer list to be proprietary information.

m.   In some instances, Uber controls the hours a driver works;

n.   Drivers are not permitted to answer passenger inquiries about booking future rides outside of the Uber App;

o.   Driving for Uber is not a specialized skill;

p.   Uber's business model depends on having a large pool of non-professional drivers;

q.   Drivers must abide by a list of regulations to drive for Uber;

r.   Uber requires its drivers to pick up Uber customers on the correct side of the street;

s.   Uber forbids its drivers from talking on their cell phones while driving customers;

t.   Uber tracks drivers' speed and braking and sends drivers reports based on how many times the driver had to brake hard;

u.   Uber drivers are not allowed to ask Uber customers for their contact information;

v.   Drivers who reject ride requests risk discipline, including suspension or termination from the platform;

w.   Consumers give feedback on rides they have taken and rate drivers on a scale from one star to five stars, which are used by Uber to discipline and terminate drivers; and

x.   Such other acts of control that discovery will show.

### *Uber's Sexual Assault Problem Started at the Top*

47.   In 2010, one of Uber's co-founders, Travis Kalanick, became its second chief executive officer and—at one time—its largest shareholder. Uber drivers and Uber split the fare that Uber sets and charges passengers for the passengers' trips.

COMPLAINT

48.     In 2014, Uber started charging Uber passengers an extra $1 fee for each trip. Uber called this a "Safe Rides Fee." When Uber announced the "Safe Rides Fee," it told the public that the "[f]ee supports our continued efforts to ensure the safest possible platform for Uber passengers and drivers, including an industry-leading background check process, regular motor vehicle checks, driver safety education, development of safety features in the app, and insurance."[3]

49.     The "Safe Rides Fee" was not split with drivers.[4] It was pure revenue for Uber.

50.     Uber collected its "Safe Rides Fee" on hundreds of millions of rides and made hundreds of millions in revenue from the fee.[5] But it never earmarked the money for improving safety or spent it on safety.[6] Instead, it pocketed the money it told the world it was going to directly towards enhancing safety. As a former Uber employee said: "We boosted our margins saying our rides were safer."[7] It "was obscene."[8]

51.     Uber's only concern was growth; not passenger safety. To increase growth—which required not only new passengers, but also new drivers—Mr. Kalanick and the executives at Uber used a background-check system designed to get new drivers on the road as quickly as possible.[9]

52.     Uber uses third-party companies to perform its background checks, including but not limited to Hirease, Inc.[10] These third-party background check providers brag about their quick turnaround time for background checks. For example, Hirease claims it can vet drivers within 36 hours.[11] To have such a short turnaround, Uber eschewed industry standards used by

---

[3] Uber, *What is the Safe Rides Fee*, (available at https://web.archive.org/web/20148420053019/http://support.uber.com/hc/en-us/articles/201950566).
[4] Mike Isaac, SUPER PUMPED: THE BATTLE FOR UBER (2019) at 136 ("The drivers, of course, got no share of the extra buck.").
[5] *Id.*
[6] *Id.*
[7] *Id.*
[8] *Id.*
[9] *Id.* at 115 ("Uber made it as easy as possible for drivers to sign up.").
[10] Mike Isaac, *Uber's System for Screening Drivers Draws Scrutiny*, NEW YORK TIMES (Dec. 9, 2014) (available at https://www.nytimes.com/2014/12/10/technology/ubers-system-for-screening-drivers-comes-under-scrutiny.html?searchResultPosition=1); *see also* Checkr, *Use Cases: Gig Marketplace*, https://checkr.com/use-cases/gig-marketplace.
[11] *Id.*

COMPLAINT

other taxi companies and livery services. For example, it abandoned fingerprinting—which takes weeks—and running applicant drivers against private databases, such as FBI records.[12] On information and belief, the third-party background checks Uber obtained on its drivers utilized features that frequently resulted in incomplete or inadequate results, including: reliance on name- or number-based background checks to verify that the person for whom the check was run was actually the driver; failure to check county-level data for all counties of residence; and failure to screen an applicant's entire criminal history as opposed to a limited period (e.g., seven years). These shortcuts led to growth for Uber. But it put people, including Plaintiff, in danger. Indeed, Uber was so fixated on growth that it began mailing cell phones to applicant drivers so that they could begin driving before Uber's cursory and ineffective background check was complete.[13]

53.    When Uber's current Chief Executive Officer, Dara Khosrowshahi, assumed that role in August 2017, Uber continued the policy of hiring drivers without biometric fingerprinting to be run through the FBI database. This was an intentional and deliberate decision, evidenced by Uber's active lobbying and resistance against municipalities or regulatory bodies implementing any kind of biometric fingerprinting requirement for drivers.[14] Uber's decisions regarding background checks are demonstrative of its long-term and ongoing prioritization of profits, growth, and efficiency over passenger safety.

54.    Mr. Kalanick also made the decision not to interview or train drivers to ensure that they understood their responsibilities and what was appropriate when interacting with passengers. Mr. Kalanick decided not to implement policies to protect passengers from sexual assault, such a zero-tolerance policy against fraternizing with passengers, making sexual advances towards passengers, or engaging in sexual activity with or sexual touching of passengers.

---

[12] *Id.*

[13] Isaac, SUPER PUMPED, at 218.

[14] Ellen Huet, *Uber Publicly Resists Fingerprinting But Is Quietly Testing It On Some Drivers*, FORBES (Oct. 14, 2015) (available at https://www.forbes.com/sites/ellenhuet/2015/10/14/uber-publicly-resists-fingerprinting-its-drivers-but-is-quietly-testing-it-live-scan/?sh=2bed4ac4c086). Curt Devine, et al., *Thousands of criminals were cleared to be Uber drivers. Here's how rideshare companies fought stronger checks*, CNN (June 1, 2018) (available at https://www.cnn.com/2018/06/01/us/felons-driving-for-uber-invs/index.html); Meir Rinde, *Philly parking czar wants to know who's driving your Uber, says Pa. audit doesn't go far enough*, WHYY PBS (Apr. 4, 2019) (available at https://whyy.org/articles/philly-parking-czar-wants-to-know-whos-driving-your-uber-says-pa-audit-doesnt-go-far-enough/).

COMPLAINT

55.     Mr. Kalanick had actual knowledge that these decisions would put passengers in greater danger. As such, Uber acted with conscious disregard for the rights and safety of Uber's passengers, especially female and LGBTQ+ passengers, including Plaintiff.

56.     Uber, including at the direction and control of Mr. Kalanick, intentionally performed the act of hiring its drivers without interviewing them, without fingerprinting them, without running them through the FBI database, and using fast and shallow background checks. When it took these actions, Uber knew or should have known that it was highly probable that harm would result. This quick-and-dirty approach represented a deliberate choice to gamble with passenger safety.

57.     Uber's greed and complete disregard for passenger safety or the rule of law is shocking. Uber's policy is that it will not report any criminal activity it learns of to law-enforcement authorities.[15] That includes allegations of sexual assault.[16] If it learns from an Uber passenger, such as Plaintiff, that they were sexually assaulted, Uber will not report this sexual assault to law enforcement.[17] Uber is proud of this policy and feels "very strongly" that it is not Uber's job to go to the police on behalf of customers when an Uber driver rapes an Uber passenger.[18]

58.     As the current CEO, Mr. Khosrowshahi has supported this non-reporting policy. Uber knew or should have known that it was highly probable that harm would result as a result of the policy because drivers will feel less constrained to commit sexual assault if they know law enforcement will not be informed.

59.     Uber's greed, parochial focus on growth, and misogyny has had tragic consequences. In December 2014, a 26-year-old finance worker hailed an Uber to take her home from a work dinner near New Delhi, India.[19] When she fell asleep in the car, her Uber driver

---

[15] Greg Bensinger, *Uber Says Safety is its First Priority. Employees Aren't so Sure*, WASHINGTON POST (Oct. 1, 2019) (available at https://www.washingtonpost.com/podcasts/post-reports/uber-says-safety-is-its-first-priority-employees-arent-so-sure/).
[16] *Id*.
[17] *Id*.
[18] *Id*.
[19] Ellen Barry and Suhasini Raj, *Uber Banned in India's Capital After Rape Accusation*, NEW YORK TIMES (Dec. 8, 2014) (available at https://www.nytimes.com/2014/12/09/world/asia/new-delhi-bans-uber-after-driver-is-accused-of-rape.html?_r=0&module=inline); Isaac, SUPER PUMPED, at 149.

moved to the backseat and raped her.[20] The driver had been detained previously for rape.[21] The rape caused an international imbroglio and New Delhi temporarily banned Uber.[22] Uber dealt with the situation by attacking the victim.

60.    Eric Alexander—president of Uber in the Asia–Pacific region, the company's "number three", and Mr. Kalanick's fixer[23]—managed to obtain the New Delhi rape victim's medical records through a law firm.[24] The records contained the medical examination that doctors performed within hours of her rape.[25] Mr. Alexander shared these records with Mr. Kalanick and Uber's number two at the time, Emil Michael.[26] Many other Uber executives either saw the records or learned of them.[27] Mr. Kalanick latched on to the fact that the victim's hymen was still intact.[28] (This despite two people pointing out to him that the victim could have been anally raped.[29]) He began cultivating and sharing a bizarre theory that the woman was not raped and that the whole incident was a plot against Uber by Olga, Uber's major ride-sharing competitor in India.[30] No matter that the Uber driver had a history of sexual assault and had confessed to police.[31]

61.    Mr. Kalanick and Uber's leadership and board were the fountainhead of Uber's culture of reckless growth, misogyny, and lawlessness.[32] When Uber customers accused Uber drivers of sexual assault—something that happened with increasing frequency as Uber grew, given its lax supervision and shoddy background checks—Mr. Kalanick would pace around Uber

[20] Isaac, SUPER PUMPED, at 149.
[21] Barry and Raj, *Uber Banned in India's Capital After Rape Accusation*.
[22] *Id.*
[23] Isaac, SUPER PUMPED, at 260.
[24] Kara Swisher and Johana Bhuiyan, *A Top Uber Executive, Who Obtained the Medical Records of a Customer Who was a Rape Victim, Has Been Fired*, VOX (June 7, 2017) (available at https://www.vox.com/2017/6/7/15754316/uber-executive-india-assault-rape-medical-records).
[25] Isaac, SUPER PUMPED, at 261.
[26] Swisher and Bhuiyan, *A Top Uber Executive, Who Obtained the Medical Records of a Customer Who was a Rape Victim, Has Been Fired*.
[27] *Id.*
[28] Isaac, SUPER PUMPED, at 261.
[29] *Id.* at 262.
[30] *Id.* at 261; Swisher and Bhuiyan, *A Top Uber Executive, Who Obtained the Medical Records of a Customer Who was a Rape Victim, Has Been Fired*.
[31] Barry and Raj, *Uber Banned in India's Capital After Rape Accusation*.
[32] Isaac, SUPER PUMPED, at 194 ("The tone of Uber's culture was being set from the top . . . The result was a workforce that largely reflected Kalanick.").

headquarters, not wondering about how to improve passenger safety but repeating the bromide, "innocent until proven guilty."[33] When law enforcement decided not to bring criminal charges against an Uber driver accused of sexual assault because it felt it did not have enough evidence for a criminal conviction, "a round of cheers would ring out across the fifth floor of Uber HQ."[34]

62.     At a cocktail and dinner party with journalists in New York City, Mr. Michael attacked journalists who criticized Uber.[35] He was particularly angry with Sarah Lacy who had, in a recent story, accused Uber of "sexism and misogyny" and had said she was going to delete her Uber App because she feared for her safety because of Uber's drivers.[36] Mr. Michael said that if any woman deleted her Uber App because of Ms. Lacy's story and was sexually assaulted, Ms. Lacy "should be held personally responsible."[37]

63.     The actions of Uber's executives and board members demonstrate Uber's contempt for women and myopic focus on profits and growth. This culture permeates the entire company and endangers Uber's passengers. In early 2017, Sarah Fowler published an explosive blog describing how pervasive this culture was at Uber.[38] Ms. Fowler was hired by Uber as a site-reliability engineer in 2016.[39] On her first day on the job, her manager sent her a message over the Uber chat system.[40] He said that he "was in an open relationship . . . and his girlfriend was having an easy time finding new partners but he wasn't. He was trying to stay out of trouble at work, he said, but he couldn't help getting in trouble, because he was looking for women to have sex with."[41] Ms. Fowler felt it "was clear that he was trying to get [her] to have sex with him, and it was so clearly out of line that [she] immediately took screenshots of [the] chat messages and reported him to" Human Resources.[42] Human Resources and "upper management" told her that

---

[33] *Id.* at 167.

[34] *Id.*

[35] Ben Smith, *Uber Executive Suggest Digging Up Dirt On Journalists*, Buzzfeed (Nov. 17, 2014) (available at https://www.buzzfeednews.com/article/bensmith/uber-executive-suggests-digging-up-dirt-on-journalists).

[36] *Id.*

[37] *Id.*; Isaac, Super Pumped, at 129.

[38] Susan Fowler, *Reflecting on One Very, Very Strange Year at Uber*, Susan J. Fowler, (Feb. 19, 2017) (available at https://www.susanjfowler.com/blog/2017/2/19/reflecting-on-one-very-strange-year-at-uber).

[39] *Id.*

[40] *Id.*

[41] *Id.*

[42] *Id.*

"even though this was clearly sexual harassment and he was propositioning [her], it was this man's first offense, and that they wouldn't feel comfortable giving him anything other than a warning and a stern talking-to."[43] Ms. Fowler was told that because her manager "was a high performer," "they wouldn't feel comfortable punishing him for what was probably just an innocent mistake on his part."[44] She was given a choice: join a new Uber team, or stay on her team under the manager who propositioned her, understanding that "[the manager] would most likely give [her] a poor performance review when review time came around, and there was nothing [Human Resources] could do about that."[45] If she chose to stick with the team she was on, Human Resources warned that a poor review by her then-manger wouldn't be retaliation because she had "been given an option."[46] Because working under a harassing manager was untenable to Ms. Fowler, she chose to switch teams.[47] She eventually learned, by talking to other women employees at Uber, that many of them had similar stories and that—contrary to what Human Resources had said—the manager who sexually harassed her had previously sexually harassed others.[48] "Within a few months, [the harasser] was reported once again for inappropriate behavior, and those who reported him were told it was still his 'first offense.' The situation was escalated as far up the chain as it could be escalated, and still nothing was done" by Uber.[49]

64. With the bad press Uber was getting because of the sexual assaults, Mr. Michael's comments, and the Sarah Fowler blog, Uber realized it needed to appear that it was making changes and trying to eradicate its toxic-male culture, so it held a company-wide meeting to announce changes. At the meeting, Uber announced that it was going to increase its diversity and sensitivity by adding a female board member. Board member David Bonderman chimed in that the addition of a woman to the board meant "it's much likelier [there will] be more talking on the board."[50]

---

[43] *Id.*
[44] *Id.*
[45] *Id.*
[46] *Id.*
[47] *Id.*
[48] *Id.*
[49] *Id.*
[50] Mike Isaac and Susan Chira, *David Bonderman Resigns From Uber Board After Sexist Remark*, NEW YORK TIMES (June 13, 2017) (available at https://www.nytimes.com/2017/06/13/technology/uber-sexual-harassment-huffington-

65. Uber's "culture was poisoned from the very top."[51] Indeed, John William Gurley was a longtime board member of Uber and a close confidant of Mr. Kalanick. He sat on his hands and watched silently as Uber put in place a culture and policies that have hurt many innocent women and LGBTQ+ people, including Plaintiff.

66. In an attempt to buff its tarnished reputation, Uber also hired former Attorney General Eric Holder and his law firm, Covington & Burling LLP, to investigate Uber's culture and work-place environment.[52]

67. During his investigation, as detailed in the publicly released "Holder Report," Attorney General Holder uncovered "a winding, repetitive list of infractions that had occurred across hundreds of global offices, including sexual assault and physical violence."[53]

68. As Uber's sexual-assault and harassment problems publicly ballooned, it made pale and perfunctory attempts to act as though it was trying to confront them. In May 2018, Uber acknowledged the "deeply rooted problem" of sexual assault and proclaimed it was committed to solving the problem, stating that "we're making some important changes today."[54] Included in these "important changes" was Uber's promise to publish a "safety transparency report that will include data on sexual assaults . . . that occur on the Uber platform."[55] Uber explained its commitment to publishing such data because "transparency fosters accountability." Uber further explained that "sexual predators often look for a dark corner" and announced to the world that "we [Uber] need to turn the lights on."

69. Despite these promises, Uber persisted in darkness and did not release any data on sexual assaults for another year and a half.

---

bonderman.html?hp=&action=click&pgtype=Homepage&clickSource=story-heading&module=inline&region=top-news&WT.nav=top-news); Isaac, SUPER PUMPED.
[51] Isaac, SUPER PUMPED, at 280.
[52] Covington & Burling, LLP, *Covington Recommendations* (available at https://www.documentcloud.org/documents/3863793-Uber-Covington-Recommendations.html).
[53] Isaac, SUPER PUMPED, at 271.
[54] Troy West, *Turning the Lights On*, Uber Newsroom (May 15, 2018) (available at https://www.uber.com/newsroom/turning-the-lights-on/).
[55] *Id.*

70.     When Uber finally released a report in December 2019, it was forced to acknowledge that there were 5,981 sexual assaults in the United States during Uber trips recorded in 2017 and 2018.[56]

71.     Uber did not release a second safety report for more than two years.

72.     On December 2, 2021, the California Public Utilities Commission approved a settlement agreement with Uber in which Uber agreed to pay $9 million and provide information on sexual assault and harassment to the CPUC on a going-forward basis.[57]

73.     It took another six months after Uber agreed to provide such data to the CPUC before Uber publicly released another safety report per its commitment in May 2018. In July 2022, it released a report covering 2019 and 2020 (a year when its ridership was decimated by the pandemic) stating it received 3,824 sexual-assault reports for that time period.[58]

74.     Uber's own data confirms that sexual assaults by Uber drivers continue to occur at an unacceptable rate.

75.     Uber has not released any sexual-assault data for 2021 or 2022. Uber's decision to withhold that data prevents Uber passengers and the public from understanding the true rate at which such assaults continue to occur each day.

76.     Uber became aware of its sexual-assault problem long before it released the Holder report. Uber's operations team "dealt with thousands of misconduct cases every year, including instances of sexual assault."[59]

77.     Uber "had so lowered the bar to become a driver that people who might have been prevented from driving in the official taxi industry could easily join Uber."[60]

---

[56] Uber, US Safety Report 2017–18 (available at https://www.uber-assets.com/image/upload/v1575580686/Documents/Safety/UberUSSafetyReport_201718_FullReport.pdf?uclick_id=f2f17920-a01a-4c4a-b1a2-abd1e253f24a).

[57] CPUC Press Release (Dec. 2, 2021) (available at https://www.cpuc.ca.gov/news-and-updates/all-news/cpuc-approves-9-million-settlement-with-uber); *see also Order Instituting Rulemaking on Regulations Relating to Passenger Carriers, Ridesharing, and New Online-Enabled Transportation Services* (available at) https://docs.cpuc.ca.gov/PublishedDocs/Published/G000/M427/K636/427636880.PDF ).

[58] Uber, US Safety Report 2019–20 (available at https://uber.app.box.com/s/vkx4zgwy6sxx2t2618520xt35rix022h?uclick_id=f2f17920-a01a-4c4a-b1a2-abd1e253f24a).

[59] Isaac, Super Pumped, at 166.

[60] *Id.* at 177.

78.     As described earlier, these decisions to lower the bar were made by Mr. Kalanick and other officers, directors, and managing agents.

79.     But Uber had not just lowered the bar: it failed to take adequate steps to provide safe transportation to passengers. For example, Uber failed to install video cameras in the cars. Such a step would have had a chilling effect on potential predators. It failed to provide an option in the Uber App that allowed female passengers to choose female drivers. And it failed to adopt adequate training of its drivers on issues of sexual assault and sexual harassment. That is, it failed to provide adequately trained drivers. These policies to fail to make Uber rides safe were put in place by Mr. Kalanick and other officers, directors, and managing agents of Uber.

80.     Mr. Kalanick's successor, Mr. Khosrowshahi, continued the policy of not requiring third-party-operated cameras in Uber vehicles.

81.     Mr. Kalanick, Mr. Khosrowshahi, and other officers, directors, and managing agents of Uber knew that if Uber put cameras in cars, fewer sexual assaults would occur during Uber rides. Uber knew that if it provided an option that would allow female passengers to choose to be driven by female drivers, fewer sexual assaults would occur during Uber rides. Uber knew that if it better trained their drivers in sexual-assault prevention, fewer sexual assaults would occur during Uber rides. Uber intentionally refused to put these safety policies in place with actual and constructive knowledge that declining to implement such policies made it highly probable that harm to female Uber passengers would result.

82.     Uber's response to driver sexual assaults that were reported to the company also evidenced the conscious disregard of Uber executives, including Mr. Kalanick and Mr. Khosrowshahi. A 2019 Washington Post investigative piece revealed Uber maintained a three-strike policy for its drivers.[61] Investigators hired by Uber to look into the more serious passenger complaints about drivers—such as drug use, physical violence, and sexual assault—reported: "A driver would only be deactivated under three circumstances: 1) if it was the second or third

---

[61] Greg Bensinger, *When rides go wrong: How Uber's investigation unit works to limit the company's liability*, WASHINGTON POST (Sept. 26, 2019) (available at https://www.washingtonpost.com/technology/2019/09/25/ubers-investigations-unit-finds-what-went-wrong-rides-its-never-companys-fault/).

COMPLAINT

reported offense; 2) if there is corroborative evidence like video or a police report; 3) if the driver admits to the assault."[62]

83.     Even with a three-strike policy, Uber executives would make exceptions to keep dangerous drivers on the road. "For instance, a New York-area driver allegedly made three separate sexual advances on passengers, said an investigator assigned to the case. After an executive overruled the investigator, the driver was allowed to continue working until a fourth incident, when a rider claimed he raped her."[63]

84.     Uber decides which drivers and passengers maintain access to its transportation platform. Uber collects safety data and information on its drivers and passengers on every trip. Uber employs Support Staff at locations around the world who interact with drivers and passengers. Many of these support staff employees are located in the Philippines.  Uber Support Staff employees record information about drivers and passengers into Uber's internal customer service relations platform. Neither drivers nor passengers have access to the information in Uber's internal customer service relations platform.

85.     Any time a driver or passenger sends a support message through the Uber App or calls Uber, they are routed to a support specialist and the communication is stored in Uber's internal customer relations platform. Uber uses the internal platform to track everything about the drivers and passengers, including driver and passenger misconduct, investigations into misconduct, and final actions levied by Uber relating to misconduct while using the Uber App.

86.     Uber's policies indicate that Uber tracks and investigates multiple types of driver and passenger misconduct that occur when drivers and passengers use Uber's transportation services. Uber sets thresholds of driver misconduct allowable to maintain access to the driver App and determines which forms of misconduct result in suspension from the Uber App and the potential lengths of suspensions.  Uber's systematic investigations of multiple types of driver misconduct put the company on notice of a driver's propensity to assault a passenger long before any assaults occur.

---

[62] *Id.*
[63] *Id.*

87.     Without a constant supply of drivers on the road, the Uber App would not be a reliable source of transportation for users seeking on-demand rides anywhere, any time. As a result, Uber chooses to allow dangerous individuals to access the driver App, creating a dangerous condition for passengers.

88.     A passenger has no knowledge of an Uber driver's prior bad actions and has no control over which driver they are paired with on any ride. Uber controls the pairings of an Uber driver to passenger on every ride. Prior to a passenger entering the Uber driver's car, a passenger is not informed that a driver has prior misconduct or suspensions from use of the Uber driver App.  Additionally, a passenger is not informed whether an Uber driver has ever been the subject of a JIRA (negative employment action) that resulted in Uber levying a strike against the Uber driver.

89.     In March of 2021, Uber and Lyft launched an "Industry Sharing Safety Program" whereby the companies would share information about driver misconduct that occur while a driver is using the respective company's platform.[64] Uber and Lyft utilize HireRight, LLC to exchange information regarding driver misconduct between the two companies. Uber does not properly inform passengers that it has received information through the safety sharing program about driver misconduct occurring on other transportation Apps.

90.     As Uber became more popular, more people realized Uber had so lowered the bar that people with checkered backgrounds could drive for Uber. People also realized that Uber had not provided everything necessary for safe rides, that is, everything that might make it more difficult to get away with sexual assaults, like video cameras in cars. In addition, they recognized Uber was at the same time marketing itself to vulnerable passengers as a safe mode of transportation, including after drinking. Because of these factors, Uber became a magnet for sexual predators—men who knew that driving for Uber meant they would get to drive intoxicated and vulnerable passengers late at night. These men started sexually assaulting passengers at alarming rates, as the Holder Report shows. And, as stated earlier, Uber and its officers, directors,

---

[64] Tony West, Uber Senior V.P. & Chief Legal Officer, *Sharing to Build a Safer Industry,* Uber Newsroom (March 12, 2021) (available at  https://www.uber.com/newsroom/industry-sharing-safety/).

and managing agents—including Mr. Kalanick—had actual knowledge that these sexual assaults were occurring on the platform and passengers were being hurt. But Uber did nothing. Uber failed to start screening drivers better and failed to place video cameras in cars. Uber intentionally refused to implement these safety measures despite actual knowledge of the problem, and these officers, directors, and managing agents—including Mr. Kalanick—had actual or constructive knowledge that refusing to do so meant there was a high probability that more passengers would be harmed, which—foreseeably—is what happened to Plaintiff.

### *Uber Misled Plaintiff and the Public into Believing It Provided Safe Rides*

91.    Uber is a transportation network company which connects its drivers to the public through the Uber App. Anyone from the public may download the Uber App for free. Using the Uber App, a customer may request a ride from one of Uber's drivers for a standardized charge unilaterally set by Uber. Uber directs its drivers to pick up the passengers and transport them to their destinations.

92.    Uber provides transportation through a digital application made available to the general public for the purpose of transporting its users—the passengers—from place to place for profit. Uber has widely offered its services to the general public and charges standard fees for its services through the Uber App. Uber represents that it does not allow discrimination against passengers on the basis of race, color, national origin, religion, gender, gender identity, physical or mental disability, medical condition, marital status, age, or sexual orientation. Any member of the public can use Uber's services for transportation.

93.    Uber employs and engages its drivers, including the driver who assaulted Plaintiff, in traditional at-will relationships.

94.    Uber actively markets itself as a safe company that provides safe rides, including late at night. These efforts continue to this day, including via email messages sent to every Uber customer.

95.    Over the years, Uber has launched marketing campaigns specifically marketing its transportation services to, among others, young women and other vulnerable individuals too intoxicated to drive.

96.     Uber represented to its customers, including Plaintiff, on its website all of the following:

a.      "How we help keep you safe—We're committed to helping you get where you want to go with confidence, whether it's building emergency features in the app or making it easy for you to check your ride."

b.      "Ride with confidence—The Uber experience was built with safety in mind. Through incident prevention tools, insurance coverage, and technology that keeps you connected, we're dedicated to helping you move safely and focus on what matters most."

c.      "Ride with confidence—Designing a safer ride—driver screenings—All potential drivers in the US must complete a screening before becoming an Uber driver-partner, and current drivers continue to be vetted for criminal offenses."

d.      "Ride with confidence—Designing a safer ride—On every trip, you can tap a button for safety tools and get help whenever you need it."

e.      "Ride with confidence—Designing a safer ride—An inclusive community—Through our joint efforts with cities and safety experts and by working together, we're helping to create safe journeys for everyone."

f.      "Our commitment to safety—You deserve to be able to move safely. To look forward to the opportunities ahead. To be connected to people and places that matter most. Which is why we're focused on your safety, from setting new standards to developing technology with the goal of reducing incidents."

g.      "How safety is built into your experience—Safety features in the app—Tap a button for emergency assistance. Share your trip details with loved ones. Our technology helps put peace of mind at your fingertips."

h.     "How safety is built into your experience—An inclusive community— Millions of riders and drivers share a set of Community Guidelines, holding each other accountable to do the right thing."

i.     "How safety is built into your experience—Coverage on every trip— We've put insurance from leading companies in place for every ride."

j.     "Building safer journeys for everyone—Rider safety—Uber driver-partners in the US go through a multi-point screening check for their driving and criminal history before they are authorized to take trips through the app. Every rider has access to safety features built into the app and a support team if you need them."

k.     "The future of safety—More than 200 Uber employees, from researchers and scientists to designers and engineers, are focused on building technology that puts safety at the heart of your experience."

l.     "Safe rides around the clock—Affordable, reliable transportation can help make roads safer. Need a late-night ride and can't drive yourself? Request a ride with Uber."

97.     Uber has cultivated an image among its customers as a safer alternative to public transportation and traditional taxis, particularly for women and LGBTQ+ passengers. Because of aggressive marketing, most Uber customers are generally unaware of the real risks associated with Uber rides and continue to believe a ride with Uber is a safer and better alternative.

98.     In 2016, Uber agreed to pay $28.5 million to settle a class-action lawsuit over its fraudulent marketing of its security screening as "industry-leading."

99.     Passengers, including Plaintiff, reasonably relied on Uber's representations and promises regarding safety and security measures. Passengers, including Plaintiff, chose to ride with Uber as a result of this reliance.

100.     On a "Women's Safety" page on its website, Uber advertised that it was "driving change for women's safety," specifically representing that "[s]exual assault and gender-based violence don't belong anywhere in our communities, which is why Uber is committed to help

stop incidents before they happen" and touting its "safety features and education" and "transparency."[65] Through such representations, Uber encourages vulnerable passengers like Plaintiff to trust its services to secure safe transportation.

101. In 2015, Uber released a report with Mothers Against Drunk Driving "MADD" stating: "The Uber App was created to ensure reliable access to safe rides." The report states that with Uber, intoxicated individuals can find "a safe, reliable ride home" that is "always within reach."[66] The report further represents that "Uber is a better late[-]night option" and reports that "93% of people would recommend Uber to a friend if they have been drinking. Not only would people take Uber themselves—they would trust Uber to take their drunk friend home safely."[67]

102. The safe image that Uber cultivates suggests to customers that riding while intoxicated with Uber is safe. Uber does not inform passengers that hailing a ride after drinking puts passengers in peril from the drivers themselves. By marketing heavily to young women and other vulnerable individuals who have been drinking, and promising safe rides, Uber puts passengers in peril.

103. Uber knew its representations and promises about passenger safety were false and misleading yet continued to allow passengers to believe in the truth of these representations and promises and continued to profit from passengers' reliance on those representations and promises.

104. Unfortunately, an Uber driver sexually assaulting a passenger is not an isolated or rare occurrence. The safety report that Uber released in December 2019 showed there were thousands of sexual assaults during Uber rides in 2018 alone.[68] Tony West, Uber's Chief Legal Officer, remarked: "[these] numbers are jarring and hard to digest."[69]

---

[65] Uber, Women's Safety (available at https://www.uber.com/us/en/safety/womens-safety/).

[66] Uber and MADD Report, "More Options. Shifting Mindsets. Driving Better Choices" (Jan. 2015) (available at http://newsroom.uber.com/wp-content/uploads/madd/uber_DUI_Report_WIP_12.12.pdf).

[67] *Id*. at 2 and 3.

[68] Kate Conger, *Uber says 3,045 sexual assaults were reported in U.S. rides last year*, NEW YORK TIMES (Dec. 5, 2019) (available at https://www.nytimes.com/2019/12/05/technology/uber-sexual-assaults-murders-deaths-safety.html).

[69] *Id*.

105.    Uber employs a vast network of drivers. But, at all relevant times, Uber provided its drivers with inadequate training regarding sexual assault, sexual relations, sexually inappropriate behavior, sensitivity, and customer relations.

106.    Uber has also provided inadequate background checks and screening of its drivers. Among other things, it does not fingerprint its drivers (unless forced to do so by state or local laws), run the applicant drivers against all available public databases, or conduct international background checks (despite its global presence).

107.    Uber lobbies state and local governments to limit what is required of Uber with respect to driver background checks. Uber also lobbies local government entities to continue allowing Uber to perform its own background checks of driver applicants, rather than municipalities performing the more stringent and reliable screening conducted for traditional taxi drivers.

108.    Uber has successfully persuaded lawmakers in several states to keep background-check requirements for its drivers limited.

109.    As a direct result of Uber's lobbying efforts, those entities largely self-enforce hiring standards for Uber's drivers. In cities where municipalities perform the screening, such as Houston and Seattle, hundreds of driver applicants Uber approved are ultimately rejected by the municipality.

110.    Although Uber claims its drivers are not employees, Uber engages its drivers as part of its business and the Uber drivers are charged with the responsibility of safely transporting Uber passengers to their destination.

### *Plaintiff Was Assaulted by an Uber Driver*

111.    Plaintiff ordered an Uber to take her home from the Cosmopolitan on November 18, 2023.  Plaintiff was late to the ride and told the driver she was worried he was going to leave. The driver told her he was never going to leave her.  The driver also insisted Plaintiff sit in the front seat.

112.    Prior to being matched by the Uber App, Plaintiff had never met the Uber driver who assaulted her. The sole reason Plaintiff and this Uber driver came in contact was the use of the Uber App for transportation services provided by the Uber driver as Uber's employee.

113.    Plaintiff ordered a shared ride, and believes the driver picked up three men and dropped them off before reaching her apartment.

114.    While driving, the Uber driver kept looking back at Plaintiff, making her feel uncomfortable.  Once the Uber driver dropped Plaintiff off at her apartment, she went inside and went to sleep.

115.    About an hour later, Plaintiff woke up and saw the Uber driver in her apartment. She was disoriented and still half-asleep.  As she came to, the Uber driver held her arms back and began raping her.

116.    Plaintiff kept telling him to stop, trying to kick him away.  But the Uber driver continued to overpower her and sexually assault her.  He did not use any form of protection while he penetrated her.

117.    The Uber driver continuously told Plaintiff to shut up; she does not remember anything else he said.

118.    Plaintiff did not tell anyone about the attack.

119.    Plaintiff was horribly traumatized by the assault.  She feels constant fear and wants to move because she hates that the Uber driver knows where she lives.  She does not feel safe and is uncomfortable in her own home.

120.    Before the attack Plaintiff had been intentionally celibate for two years.  This fact made the rape even more violating and disturbing to Plaintiff.

121.    Plaintiff continues to suffer from the trauma of the attack.  She is scared to be alone and suffers from emotional distress.

122.    Uber knew or should have known of the Uber driver's propensity to engage in sexual harassment, battery, sexual assault, or to otherwise attack passengers such as Plaintiff.

123.    Nonetheless, Uber may have continued to employ the Uber driver and to dispatch him as an Uber driver to pick up passengers, including Plaintiff.

124.    None of Uber's passengers, including Plaintiff, were notified in any way of the Uber driver's propensity to engage in sexual harassment, battery, sexual assault, or to otherwise attack passengers such as Plaintiff prior to their rides.

125.    Uber had actual and constructive knowledge of the risk of sexual assault by rideshare drivers generally and sexual assault by its own rideshare drivers against its own passengers, as demonstrated by its acknowledgement of thousands of reported sexual assaults annually involving the Uber App.

126.    Uber could have prevented and properly responded to Plaintiff's assault, but took no such action.

## CAUSES OF ACTION
### Count I: General Negligence

127.    Plaintiff incorporates by reference the allegations in the preceding paragraphs.

128.    By providing transportation to the general public using the Uber App and network of drivers, Uber owed a duty to act with due and reasonable care towards the public and in particular its own passengers, including Plaintiff.

129.    Uber has been on notice that its drivers have been sexually harassing, sexually assaulting, battering, or otherwise attacking its passengers since at least 2014. Uber was or should have been aware that some of its drivers would continue to sexually harass, sexually assault, physically assault, kidnap, rape, batter, or otherwise attack vulnerable customers and passengers.

130.    Since learning of the sexual assaults and other misconduct perpetrated by its drivers, Uber has not adapted or improved its safety procedures in any meaningful way.

131.    Uber does not require video monitoring of its drivers that cannot be turned off, nor does it provide emergency notification to Uber and the authorities when a driver drastically veers off course from the passenger's destination, abruptly cancels the ride, or ends the ride at the intended destination while GPS data indicates the passenger remains in the car for an extended period of time.

132.    At all times relevant, Uber was aware of the dangers its drivers posed, yet it still induced, and continues to induce, the public, including Plaintiff, to rely on Uber as a safe means

of transportation. In doing so, Uber failed to warn passengers, including Plaintiff, of the possibility of being assaulted, battered, harassed, or otherwise attacked by an Uber driver.

133.    At the time Plaintiff was assaulted, Uber did not require sexual harassment or assault training for its drivers, nor did it have any policies in place for immediate termination if a driver engages in sexual misconduct.

134.    Uber does not cooperate with the police when a driver commits an illegal sexual attack on its passengers. Despite having the express right to disclose driver information at Uber's sole discretion, Uber requires that extensive standards be met before the company will consider law enforcement requests for information. After a report of sexual assault has been made, Uber generally requires a subpoena before it will release information. Uber's policy of noncooperation discourages police agencies from making recommendations to local prosecutors to file complaints against Uber drivers, and provides Uber's predatory drivers with tacit assurance that illegal attacks will not be detected by law enforcement.

135.    When hiring new drivers, Uber does not verify driver identities with biometric background checks. Uber does not correct for false negatives created by its name-based screening procedures. Uber does not provide industry-standard background checks that would provide the most comprehensive means of screening applicant drivers. Uber does not invest in continuous monitoring of its drivers and is not immediately alerted when one of its drivers is implicated in criminal acts.

136.    Uber does not have a consistent, reliable system for addressing passenger reports of sexual assault by its drivers and continues to let dangerous predators drive for and earn money for Uber.

137.    On information and belief, despite receiving one or more complaints and or reports from passengers or strikes from Uber involving Plaintiff's Uber driver, Uber continued to allow him access to the Uber App. Uber knew or should have known that Plaintiff's Uber driver was dangerous and created a dangerous condition for passengers matched with him, but nonetheless him with Plaintiff.

138.    Uber's acts and omissions as alleged herein constitute a breach of its duty of reasonable care to Plaintiff.

139.    Uber's acts and omissions as alleged herein constitute negligent, careless, and reckless conduct which resulted in serious injury to Plaintiff.

140.    As a direct and proximate result of Uber's acts and omissions as alleged herein, Plaintiff was sexually assaulted by an Uber driver.  The assault traumatized, humiliated, and degraded Plaintiff, robbing her of her dignity and sense of personal safety.  The assault caused Plaintiff to suffer physical and psychological harm from which she may never fully recover.

141.    As a direct and proximate result of Uber's general negligence, Plaintiff suffered both economic and non-economic damages.

142.    Plaintiff will seek actual and punitive damages based on Uber's above-described actions, which evidence wanton and reckless disregard for the safety of passengers like Plaintiff, as well as appropriate injunctive or equitable relief to protect Plaintiff and passengers like her.

### Count II: Negligent Hiring, Retention, and Supervision

143.    Plaintiff incorporates by reference the allegations in the preceding paragraphs.

144.    Uber hired the Uber driver who assaulted Plaintiff as described above.

145.    Uber failed to conduct an adequate background check, interview, check the references of, provide training to, or advise the Uber driver of any anti-sexual assault or harassment policies. Uber had no reasonable basis for believing Uber drivers in general were fit to drive its passengers, which included vulnerable and intoxicated passengers, and failed to use reasonable care in determining whether the driver in question was fit for the task. Uber should have known of the unfitness of the Uber driver involved in the assault on Plaintiff but failed to use reasonable care to discover his unfitness and incompetence.

146.    Additionally, Uber maintains overwhelming data and information about the Uber driver's performance and actions while driving for Uber. Despite being aware that the Uber driver was a safety risk to Plaintiff, Uber allowed him to continue driving for and earning money for Uber and specifically matched him with Plaintiff on the Uber App, providing the Uber driver with an opportunity to sexually assault Plaintiff—which the Uber driver then did.

147.    Despite failing to reasonably endeavor to investigate the incompetence of Uber drivers, including the one who harmed Plaintiff, to carry out the task of safely transporting passengers, Uber hired said driver to do exactly that.

148.    Uber knew or should have known that assigning the task of transporting passengers to an inadequately screened, trained, or monitored driver created an unreasonable risk of harm to Uber's passengers, including Plaintiff, particularly when Uber had been on notice of the string of sexual assaults committed by Uber's drivers.

149.    Uber failed to employ measures to adequately supervise its drivers.

150.    Uber failed to adequately record, investigate, and respond to passenger reports of unsafe conduct such as sexual harassment and sexual assault by Uber drivers.

151.    Uber was negligent in failing to terminate drivers it knew or reasonably should have known were a threat to passengers, including but not limited to Plaintiff and other vulnerable female and LGBTQ+ passengers.

152.    The Uber driver who assaulted Plaintiff was or became unfit to perform the work for which he was hired as he improperly and illegally took advantage of Plaintiff when Plaintiff attempted to use the service for a safe ride to Plaintiff's destination, causing Plaintiff harm.

153.    Because of the Uber driver's unfitness to perform the task of transporting Plaintiff, Plaintiff was assaulted, which traumatized, humiliated, degraded, violated, and robbed of her dignity and sense of personal safety.

154.    Uber's negligence in hiring, retaining, and or supervising Uber drivers, including the driver who harmed Plaintiff, caused Plaintiff to be assaulted by an Uber driver.  The assault traumatized, humiliated, and degraded Plaintiff, robbing her of her dignity and sense of personal safety.  The assault caused Plaintiff to suffer physical and psychological harm from which she may never fully recover.

155.    As a direct and proximate result of Uber's negligent supervision, hiring, and retention of Uber drivers, including the driver who harmed Plaintiff, Plaintiff suffered economic and non-economic damages.

156.     Plaintiff will seek actual and punitive damages based on Uber's above-described actions, which evidence wanton and reckless disregard for the safety of passengers like Plaintiff, as well as appropriate injunctive or equitable relief to protect Plaintiff and passengers like her.

### Count III: Failure to Warn

157.     Plaintiff incorporates by reference the allegations in the preceding paragraphs.

158.     Uber's conduct created a risk of physical or emotional harm to its passengers, including Plaintiff.

159.     In operating its business, Uber knew and had reason to know that its passengers were at risk of sexual assault and abuse by Uber's drivers since at least 2014. Since then, Uber has received frequent passenger complaints about driver misbehavior and misconduct, has been notified of police investigations of drivers' criminal conduct while acting in their capacity as Uber drivers, and has been the subject of numerous civil suits alleging the sexual harassment and assault of Uber's passengers by Uber's drivers. Notably, Uber acknowledges that sexual misconduct is underreported, such that reports it does receive are an undercount of the total number of sexual assaults and other forms of sexual misconduct occurring on its platform.[70]

160.     Despite the knowledge of the danger its enterprise created, Uber prioritized profits over passenger safety and did not alert its passengers, including Plaintiff, to the risk of physical or sexual assault by Uber drivers. In fact, Uber continued to market itself as a service that provides "safe" rides, including to unaccompanied or intoxicated passengers, knowing sufficient measures had not been employed to keep passengers safe from being physically or sexually assaulted.

161.     Uber itself represented to its passengers that riding with Uber is safe, implying it is free of risk from physical and sexual assault.

162.     Uber did not warn that its criminal background checks of Uber drivers were limited, nor did it warn that it sometimes allowed drivers to continue driving for Uber after a passenger reported to Uber that they were physically or sexually assaulted or harassed.

163.     Uber had reason to know that passengers would be unaware of the risk of physical or sexual assault by Uber drivers.

---

[70] Second Uber US Safety Report, at 62 (June 30, 2022), https://www.uber.com/us/en/about/reports/us-safety-report/.

COMPLAINT

164.    A warning to its passengers that they were at risk of physical or sexual assault by Uber drivers would have reduced the risk of harm to passengers, including Plaintiff, who could have arranged for alternative transportation or taken additional safety precautions and avoided the assaults they suffered at the hands of Uber drivers.

165.    Plaintiff would not have ridden in an Uber had Uber provided an adequate warning regarding the risk of being assaulted, battered, harassed, or otherwise attacked by an Uber driver.

166.    As a legal and proximate result of Uber's actions and omissions, Plaintiff was assaulted by an Uber driver.  The assault traumatized, humiliated, and degraded Plaintiff, robbing her of her dignity and sense of personal safety.  The assault caused Plaintiff to suffer physical and psychological harm from which she may never fully recover.

167.    As a direct and proximate result of Uber's negligent failure to warn, Plaintiff suffered economic and non-economic damages.

168.    Plaintiff will seek actual and punitive damages based on Uber's above-described actions, which evidence wanton and reckless disregard for the safety of passengers like Plaintiff, as well as appropriate injunctive or equitable relief to protect Plaintiff and passengers like her.

### Count IV: Intentional Misrepresentation

169.    Plaintiff incorporates by reference the allegations in the preceding paragraphs.

170.    At the time Plaintiff was assaulted, Plaintiff had downloaded the Uber App and had an account with Uber.

171.    Uber represented to Plaintiff and the general public that safety was Uber's top priority, and it was Uber's goal to make every ride safe, comfortable, and reliable. At the same time, Uber already knew that a number of its drivers had preyed on vulnerable passengers by sexually molesting, assaulting, harassing, or raping them.

172.    Uber made intentional misrepresentations of fact to all users of the Uber App, including Plaintiff, that were known by Uber to be false, including that Uber would provide Plaintiff with a safe ride to Plaintiff's destination.

173.    These representations regarding safety were made to Uber customers, including Plaintiff, through periodic emails Uber sent to its customers, social-media advertisements, and

Uber's own website and Uber App. Plaintiff relied upon advertisements and statements where Uber proclaimed it would provide a safe ride.

174.    Prioritizing profits over passenger safety, Uber made these intentional misrepresentations of material fact to induce vulnerable individuals, including Plaintiff, to use Uber's services.

175.    Uber made these representations to Plaintiff and the general public despite knowing it had chosen not to take the measures necessary to provide a safe ride to Plaintiff's intended destination and, as a result, continued physical or sexual assault of its passengers by its drivers was a foreseeable occurrence.

176.    Uber made these representations to induce women and LGBTQ+ people, like Plaintiff, to use Uber's services and to derive profit from people like Plaintiff.

177.    In ordering and entering an Uber vehicle, Plaintiff reasonably relied on Uber's representations that it would get Plaintiff safely to Plaintiff's destination.

178.    In trusting and relying on Uber's representations, Plaintiff was placed in a vulnerable position that was taken advantage of by the Uber driver who assaulted Plaintiff.

179.    As a direct and proximate result of Uber's intentional misrepresentations, Plaintiff was assaulted by an Uber driver.  The assault traumatized, humiliated, and degraded Plaintiff, robbing her of her dignity and sense of personal safety.  The assault caused Plaintiff to suffer physical and psychological harm from which she may never fully recover.

180.    As a direct and proximate result of Uber's intentional misrepresentations, Plaintiff suffered economic and non-economic damages.

181.    Plaintiff will seek actual and punitive damages based on Uber's above-described actions, which evidence wanton and reckless disregard for the safety of passengers like Plaintiff, as well as appropriate injunctive or equitable relief to protect Plaintiff and passengers like her.

### *Count V: Negligent Misrepresentation*

182.    Plaintiff incorporates by reference the allegations in the preceding paragraphs.

183.    Uber represented to Plaintiff and the general public that safety is Uber's top priority, and that it is Uber's goal to make every ride safe, comfortable, and reliable. At the time

of the assault alleged, Uber knew that a number of its drivers had previously preyed on vulnerable female and LGBTQ+ passengers by sexually molesting, assaulting, harassing, or raping them.

184.    Uber continued to represent that its services were safe to further Uber's own pecuniary interests.

185.    In choosing to represent to its users that its services were safe, Uber had a duty to provide correct and accurate information about the actual safety of its services.

186.    Uber knew or should have known that it could not provide the safe ride that it represented.

187.    Knowing of the incidence of sexual assault of its passengers by its drivers and knowing that Uber had not implemented adequate precautions, Uber had no reasonable grounds for believing that it could provide Plaintiff and other passengers a safe ride as represented.

188.    In getting into the Uber, Plaintiff reasonably relied on Uber's representations that it would get Plaintiff safely to Plaintiff's intended destination.

189.    In trusting and relying on Uber's representations, Plaintiff was placed in a vulnerable position that was taken advantage of by an Uber employee, the Uber driver, who assaulted Plaintiff.

190.    As a direct and proximate result of Uber's conduct, Plaintiff was assaulted by an Uber driver.  The assault traumatized, humiliated, and degraded Plaintiff, robbing her of her dignity and sense of personal safety.  The assault caused Plaintiff to suffer physical and psychological harm from which she may never fully recover.

191.    As a direct and proximate result of Uber's negligent misrepresentations, Plaintiff suffered economic and non-economic damages.

192.    Plaintiff will seek actual and punitive damages based on Uber's above-described actions, which evidence wanton and reckless disregard for the safety of passengers like Plaintiff, as well as appropriate injunctive or equitable relief to protect Plaintiff and passengers like her.

### *Count VI: Negligent Infliction of Emotional Distress*

193.    Plaintiff incorporates by reference the allegations in the preceding paragraphs.

194.    Since at least 2014, Uber has received frequent passenger complaints about driver misconduct, has been notified of police investigations of the criminal conduct of drivers acting within their capacity as Uber drivers, and has been the subject of numerous civil suits alleging the sexual harassment and assault of Uber's passengers by Uber's drivers.

195.    Uber made a conscious decision not to implement procedures that would effectively screen its drivers and monitor its drivers to identify and terminate drivers who were sexual predators.

196.    Safety precautions such as enhanced background checks, biometric fingerprinting, job interviews, electronic monitoring systems, warnings to passengers of the dangers of being attacked by Uber drivers, and cooperation with law enforcement when a driver attacks a passenger, would have cost Uber money and reputational damage. Because of this, Uber decided not to implement such precautions, and instead continues to place its passengers at greater risk of assault and harassment by Uber's own drivers.

197.    Additional safety precautions that Uber chose not to make include, but are not limited to: ongoing monitoring of Uber drivers through available technology including cameras and GPS; a zero-tolerance policy for drivers who deviate from expected behavior by leaving the vehicle with passengers, or by deviating substantially from the assigned route; a zero-tolerance program for sexual assault and guidelines mandating immediate termination; creating and instituting a system encouraging customer reporting; and adequate monitoring of customer complaints by well-trained and effective customer-service representatives. Uber chose not to implement such precautions, nor did it warn passengers of the risk of being physically or sexually assaulted given that these safety precautions had not been implemented.

198.    In failing to take these and other safety precautions designed to protect passengers from sexual predators driving for Uber, Uber breached its duty of reasonable care, negligently inflicting emotional harm upon Plaintiff, and acted recklessly and in conscious disregard of her safety.

199.    As a direct and proximate result of Uber's negligent infliction of emotional distress, Plaintiff suffered economic and non-economic damages.

200.     Plaintiff will seek actual and punitive damages based on Uber's above-described actions, which evidence wanton and reckless disregard for the safety of passengers like Plaintiff, as well as appropriate injunctive or equitable relief to protect Plaintiff and passengers like her.

### Count VII: Vicarious Liability for Uber Driver's Torts

201.     Plaintiff incorporates by reference the allegations in the preceding paragraphs.

202.     Uber is vicariously liable for the torts of its driver through the theories of respondeat superior, non-delegable duties, agency, and ostensible agency. Uber's liability for the acts of its driver is not contingent upon the classification of its driver as an employee.

203.     Under the doctrine of respondeat superior, Uber is responsible for the torts of its employees committed within the course and scope of employment. Uber drivers are employees and agents of Uber. Uber reserves the right to control the activities of Uber drivers, as set forth above, including but not limited to by controlling: the prices charged to customers; contact with the customer base; and the ability of drivers to see where they will be driving before beginning a ride. Uber also reserves the right to terminate drivers with or without cause.

204.     The assault on Plaintiff perpetrated by the Uber driver occurred while the Uber driver was logged into the Uber App as a driver, during or immediately following a ride arranged using the Uber App and for which Uber had matched Plaintiff with the Uber driver.  The Uber driver's employment with Uber allowed him to be alone with Plaintiff and exert control over Plaintiff. The source of the assault on Plaintiff was the Uber driver's employment with Uber and specifically activities related to their duties as Uber's employee, including but not limited to driving passengers.

205.     The sexual assault Plaintiff experienced at the hands of an Uber driver was foreseeable, related to, connected to, and otherwise within the course and scope of their employment by Uber.

206.     The assault perpetrated against Plaintiff occurred within the work-related limits of time and place, that is, in the vehicle registered by the Uber driver with the Uber App and during or immediately following the ride for which the Uber App had matched Plaintiff and the Uber driver as passenger and driver.

207.    Uber is vicariously liable under the doctrine of respondeat superior for the sexual assault and battery perpetrated against Plaintiff and occurring in the course and scope of employment its Uber driver.

208.    Uber may maintain that its drivers are contractors and not employees. Nevertheless, whether Uber drivers are characterized as contractors, employees, or agents, Uber has a non-delegable duty to transport its passengers safely.

209.    The doctrine of non-delegable duty recognizes that for public-policy reasons, certain duties cannot be delegated to a third party. It operates to ensure that when a harm occurs the injured party will be compensated by the party whose activity caused the harm and who may therefore properly be held liable for the acts of his agent, whether the agent was an employee or an independent contractor. The doctrine recognizes that an entity may not delegate its duties to a contractor to evade its own responsibilities. This is especially so when allowing delegation would incentivize the employers to hire incompetent contractors to further the employer's pecuniary interests.

210.    In advertising to passengers, including Plaintiff, that Uber provides them a safe ride to their destinations, and by profiting off women and LGBTQ+ people who use Uber for that very purpose but then are attacked, Uber has a duty to its passengers that cannot be delegated. To allow Uber to delegate the liability for the assaults committed by its drivers to anyone else would encourage Uber to continue to utilize the cheapest, fastest, and most haphazard safety procedures. Uber would be disincentivized from hiring only competent drivers, since the more drivers Uber has, the more money Uber makes.

211.    Further, Uber drivers act as agents of and operate as extensions of Uber. Uber drivers represent Uber's business and further Uber's pecuniary interests.

212.    Uber drivers display the Uber logo when interacting with passengers, and in many cases Uber drivers are the only people in the company with whom Uber's passengers have direct contact. Uber drivers provide the service that Uber claims to provide—transportation.

213.    By allowing Uber drivers to represent Uber's business, Uber creates the impression that its drivers, including the Uber driver at issue here, were Uber's employees or agents.

214.    Plaintiff reasonably believed that the Uber driver was an employee or agent of Uber, and, relying on this belief, got in a vehicle with him in exchange for a fee and suffered harm as a result unwanted sexual contact with the driver.

215.    For these reasons and others, Uber is vicariously liable for the tortious acts of its drivers, regardless of whether Uber's drivers are employees, agents, apparent agents, or contractors of Uber.

216.    As a direct and proximate result of the Uber driver's tortious conduct, Plaintiff was assaulted by an Uber driver.  The assault traumatized, humiliated, and degraded Plaintiff, robbing her of her dignity and sense of personal safety.  The assault caused Plaintiff to suffer physical and psychological harm from which she may never fully recover.

217.    As a direct and proximate result of Uber driver's tortious conduct for which Uber is legally liable, Plaintiff has suffered economic and general, non-economic damages according to proof.

218.    Plaintiff will seek actual and punitive damages based on Uber's above-described actions, which evidence wanton and reckless disregard for the safety of passengers like Plaintiff, as well as appropriate injunctive or equitable relief to protect Plaintiff and passengers like her.

### Count VIII: Vicarious Liability for Sexual Assault/Battery

219.    Plaintiff incorporates by reference the allegations in the preceding paragraphs.

220.    The Uber driver made harmful and offensive contact with Plaintiff.

221.    Plaintiff did not consent to the contact.

222.    The Uber driver intentionally and recklessly committed acts that resulted in harmful and offensive contact with Plaintiff's person and touching of Plaintiff in a sexual manner.

223.    As a result of the Uber driver's sexual battery of Plaintiff, which occurred in the course and scope of Uber driver's employment, Plaintiff was assaulted.  The assault traumatized, humiliated, and degraded Plaintiff, robbing her of her dignity and sense of personal safety.  The

assault caused Plaintiff to suffer physical and psychological harm from which she may never fully recover.

224.    As a direct and proximate result of the sexual battery committed by the Uber driver, and Uber's liability and vicarious liability for the same, Plaintiff suffered economic and non-economic damages.

225.    Plaintiff will seek actual and punitive damages based on Uber's above-described actions, which evidence wanton and reckless disregard for the safety of passengers like Plaintiff, as well as appropriate injunctive or equitable relief to protect Plaintiff and passengers like her.

### Count IX: Vicarious Liability for False Imprisonment

226.    Plaintiff incorporates by reference the allegations in the preceding paragraphs.

227.    The Uber driver willfully detained Plaintiff.

228.    The Uber driver's detention of Plaintiff was without Plaintiff's consent.

229.    The Uber driver's detention of Plaintiff was unlawful.

230.    As a direct and proximate result of the false imprisonment committed by the Uber driver and Uber's liability and vicarious liability for the same, Plaintiff suffered economic and non-economic damages.

231.    Plaintiff will seek actual and punitive damages based on Uber's above-described actions, which evidence wanton and reckless disregard for the safety of passengers like Plaintiff, as well as appropriate injunctive or equitable relief to protect Plaintiff and passengers like her.

### Count X: Strict Product Liability - Design Defect

232.    Plaintiff incorporates by reference the allegations in the preceding paragraphs.

233.    Uber designed, manufactured, and otherwise distributed the Uber App.

234.    The Uber App did not perform as an ordinary consumer would have expected it to perform when used or misused in an intended or reasonably foreseeable way because the Uber App falsely led Plaintiff to form a reasonable minimum safety expectation that was not met.

235.    The Uber App did not include safety features such as a GPS tracking system that would alert Uber to issues, including but not limited to a passenger remaining in a stopped or travelling Uber vehicle after the driver ended the ride in the Uber App. It also did not include

automatic activation in the driver's phone while a ride was in progress or automatic notification of law enforcement of suspicious circumstances that suggest a passenger may be in danger, including but not limited to route deviations or passengers remaining in Uber vehicles for extended periods after the conclusion of a ride.

236.    In addition, the Uber App includes a rating system whereby drivers and passengers rate each other. Passengers who give drivers low- or one-star ratings will not be matched with the same driver again. This does not, however, prevent the Uber App from matching different passengers with that driver. Similarly, if an Uber driver is the subject of a complaint or report by a passenger, or receives a "strike" from Uber, the Uber App will not match that driver with the same passenger; this does not, however, prevent the Uber App from matching different passengers with that driver. Thus, the Uber App allows drivers who have been the subject of prior complaints, reports, strikes, or low- or one-star ratings to be matched with future passengers, who are not notified of this history or the risks posed by the driver which are known or should be known by Uber.

237.    The Uber App also failed to communicate with passengers, including Plaintiff, a true expectation of the lack of safety in using Uber.

238.    These flaws in the design of the Uber App, were a substantial factor in causing harm to Plaintiff, which included being assaulted by an Uber driver.  The assault traumatized, humiliated, and degraded Plaintiff, robbing her of her dignity and sense of personal safety.  The assault caused Plaintiff to suffer physical and psychological harm from which she may never fully recover.

239.    As a direct and proximate result of Uber's acts and omissions, Plaintiff suffered economic and non-economic damages.

240.    Plaintiff will seek actual and punitive damages based on Uber's above-described actions, which evidence wanton and reckless disregard for the safety of passengers like Plaintiff, as well as appropriate injunctive or equitable relief to protect Plaintiff and passengers like her.

### Count XI:  Strict Product Liability - Failure to Warn

241.    Plaintiff incorporates by reference the allegations in the preceding paragraphs.

1    242.    Uber designed, manufactured, and distributed the Uber App.

2    243.    The Uber App presented potential risks of introducing each driver to a passenger

3    who, because of the nature of the ridesharing arrangement created and facilitated by the Uber

4    App, could neither escape from the Uber driver's vehicle nor control the place where the driver

5    would take the passenger, which could result in the sexual assault of that passenger; these are

6    risks that were known or knowable at the time of manufacture and distribution of the Uber App.

7    244.    The potential risks presented a substantial danger when the Uber App was used or

8    misused in an intended or reasonably foreseeable way.

9    245.    Ordinary consumers such as Plaintiff would not have recognized the potential

10    risks.

11    246.    Uber failed to adequately warn consumers, including Plaintiff, of these potential

12    risks.

13    247.    Uber's failure to provide passengers, including Plaintiff, with sufficient warnings

14    regarding the risk of harm to which they were being exposed with each Uber ride was a

15    substantial factor in causing the harm suffered by Plaintiff, including being assaulted by an Uber

16    driver.  The assault traumatized, humiliated, and degraded Plaintiff, robbing her of her dignity

17    and sense of personal safety.  The assault caused Plaintiff to suffer physical and psychological

18    harm from which she may never fully recover. As a direct and proximate result of Uber's acts and

19    omissions, Plaintiff suffered economic and non-economic damages.

20    248.    Plaintiff will seek actual and punitive damages based on Uber's above-described

21    actions, which evidence wanton and reckless disregard for the safety of passengers like Plaintiff,

22    as well as appropriate injunctive or equitable relief to protect Plaintiff and passengers like her.

23    **PUNITIVE DAMAGES**

24    249.    Plaintiff will seek actual and punitive damages based on Uber's above-described

25    actions, which evidence wanton and reckless disregard for the safety of passengers like Plaintiff.

26    250.    As stated above, Uber knew that it faced an ongoing problem of sexual predators

27    driving for Uber and assaulting its passengers. As early as 2014 Uber knew that its drivers were

28    physically and sexually assaulting passengers. Since 2014, Uber has received frequent passenger

complaints about driver physical and sexual misconduct (including physical or sexual assault and rape), been notified of police investigations of the criminal physical or sexual conduct of drivers acting within their capacity as Uber drivers, and been the subject of numerous civil suits and arbitrations alleging the sexual harassment and physical and sexual assault of Uber's passengers by Uber's drivers.

251.    Uber was fully aware of its sexual predator problem, but failed to take meaningful safety precautions to protect its passengers.

252.    Even after Uber was aware some Uber drivers were using driving for Uber as an opportunity to get unsuspecting women and LGBTQ+ people into their vehicles and to physically and sexually assault them, Uber and its executing officers made the conscious decision not to implement measures to thoroughly vet its drivers before and after hiring them.

253.    The decision not to implement more thorough and persistent background checks was driven by Uber executives' desire for rapid expansion and increased profits, because the more drivers driving for Uber, the more money there was to be made.

254.    Prioritizing profits over safety, Uber and its executive officers also made the decision not to warn its users of the risk of being assaulted.

255.    Safety precautions such as: enhanced background checks; biometric fingerprinting; job interviews; electronic monitoring systems; ongoing monitoring of Uber drivers and rides through available technology including cameras and GPS; a zero-tolerance policy for drivers who deviate from expected behavior by leaving the vehicle with passengers or by deviating substantially from the assigned route; a warning system for when a driver significantly deviates from the intended route or prematurely terminates a ride; a system for checking in with and verifying a passenger's safety when a driver prematurely terminates a ride or significantly deviates from the intended route; a zero-tolerance program for sexual assault and guidelines mandating immediate termination; a zero-tolerance policy for fraternizing with passengers; creating and instituting a system encouraging customer reporting; adequate monitoring of customer complaints by well-trained and effective customer-service representatives; warnings to passengers of the dangers of being attacked by Uber drivers; and cooperation with law

1    enforcement when a driver attacks a passenger, would have cost Uber money and reputational

2    damage. Because of this, Uber, at the direction of its corporate officers, decided not to implement

3    such precautions, and instead has continued to place its passengers at greater risk of kidnapping,

4    sexual assault, rape, and exploitation by Uber's own drivers.

5          256.   Prioritizing profits over passenger safety, Uber and its executive officers acted,

6    and continue to act, recklessly and in knowing, conscious disregard of the safety of its passengers,

7    including that of Plaintiff, and the public.

8          257.   As a direct and proximate result of the intentional, negligent, reckless, grossly

9    negligent conduct of Uber, Plaintiff was assaulted by an Uber driver.  The assault traumatized,

10   humiliated, and degraded Plaintiff, robbing her of her dignity and sense of personal safety.  The

11   assault caused Plaintiff to suffer physical and psychological harm from which she may never fully

12   recover.

13         258.   As a result of Uber's misconduct as stated above, Plaintiff seeks punitive damages

14   to punish Uber for its misconduct and to deter future misconduct.

15                            **PRAYER FOR RELIEF**

16   Plaintiff prays for the following relief:

17         1.     Entry of judgment on each of her claims against Defendants jointly and severally;

18         2.     Past and future economic and non-economic damages including physical pain,

19   mental anguish, anxiety, medical expenses, lost earnings or earning capacity;

20         3.     Punitive damages;

21         4.     Pre- and post-judgment interest;

22         5.     The costs and expenses of litigation;

23         6.     Attorneys' fees;

24         7.     Injunctive or equitable relief; and

25         8.     Such other relief as this Court may deem just and proper.

26

27

28

COMPLAINT

1    Dated: March 12, 2024                    /s/ *Sarah R. London*
                                             Sarah R. London (CA Bar No. 267083)
2                                            Caitlin M. Nelson (CA Bar No. 335601)
                                             Annie M. Wanless (CA Bar No. 339635)
3                                            **LIEFF CABRASER HEIMANN & BERNSTEIN,**
                                             **LLP**
4                                            275 Battery Street, 29th Floor
                                             San Francisco, CA 94111
5                                            Phone: (415) 956-1000
                                             slondon@lchb.com
6                                            cwoods@lchb.com
                                             awanless@lchb.com
7
                                             Andrew R. Kaufman (MDL *pro hac vice*)
8                                            222 Second Ave. S., Suite 1640
                                             Nashville, TN 37201
9                                            Phone: (615) 313-9000
                                             akaufman@lchb.com
10
                                             *Attorneys for Plaintiff*
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COMPLAINT